United States Court of Appeals,

Eleventh Circuit.

No. 95-4807.

Barbara PARRISH, Dennis Wetzel, and Robert Lucas, Plaintiffs-
Appellants,

v.

Gary R. NIKOLITS, individually and in his official capacity as
the Property Appraiser of Palm Beach County, Florida, Defendant-
Appellee.

July 3, 1996.

Appeal from the United States District Court for the Southern
District of Florida. (No. 93-8322-CIV-KLR), Kenneth L. Ryskamp,
Judge.

Before CARNES and BARKETT, Circuit Judges, and DYER, Senior Circuit
Judge.

BARKETT, Circuit Judge:

Barbara Parrish, Dennis Wetzel and Robert Lucas appeal the

district court's grant of Gary Nikolits's motion for summary

judgment in both his individual and official capacities on their

claim that Nikolits violated their First Amendment rights by firing

them because they supported Nikolits's opponent in a recent

election.[1]  Parrish, Wetzel and Lucas were longtime employees of

the Palm Beach County Property Appraiser's Office.  Nikolits was

the newly-elected Palm Beach County Property Appraiser.

Insofar as Nikolits was sued in his official capacity, we

vacate the order granting summary judgment and remand because the

district court applied the wrong standard in determining that

Parrish, Wetzel and Lucas held positions in the Appraiser's Office

---

[1]Parrish, Wetzel and Lucas sued Nikolits under 42 U.S.C. §
1983 alleging that he violated their First Amendment rights to
free speech and association.

that were susceptible to patronage dismissal.  Insofar as Nikolits was sued in his individual capacity, we affirm the grant of summary judgment because the law was not clearly established that dismissing Parrish, Wetzel and Lucas for political reasons violated their First Amendment rights.

## I. Facts & Procedural Background

Parrish was Human Resources Director, Wetzel was Information Technologies Director, and Lucas was Manager of the Property Analysis Section of the Palm Beach County Property Appraiser's Office.  During the 1992 election for county property appraiser, all three supported the Democratic candidate against Nikolits, who was the Republican candidate and ultimate winner of the race for County Property Appraiser.

After his election, but before taking office, Nikolits notified Parrish, Wetzel and Lucas, as well as five other Appraiser's Office employees, that he planned to fire them because they had not supported him in the elections.  Parrish's attorney sent Nikolits a letter stating that such action would violate Supreme Court cases prohibiting patronage firings of non-political public employees.  Nonetheless, the day he took office, Nikolits fired Parrish, Wetzel and Lucas, as well as the five other employees.

Prior to Nikolits taking office in January, 1993, Rebecca Walker was Palm Beach County Appraiser[2] from 1982 to 1993.

---

[2]In Florida, the office of the county property appraiser is a constitutionally created office. *See* Fl. Const. Art. VIII, § 1(d).  The county property appraiser is charged with "determining the value of all property within the county, with maintaining certain records connected therewith, and with determining the tax

Although Parrish, Wetzel and Lucas all had been promoted during Walker's tenure, none of the three had been hired by Walker. Parrish and Lucas had worked for the Appraiser's Office in various capacities since 1976 and 1981, respectively. Wetzel had worked for either the Appraiser's Office or Palm Beach County since 1970. All three thus had been employees of the Appraiser's Office or Palm Beach County through the terms of at least two county appraisers prior to Nikolits taking office in 1993.

After Nikolits fired them, Parrish, Wetzel and Lucas sued Nikolits in both his individual and official capacities, alleging that he had violated their First Amendment rights by firing them for supporting his political opponent in the campaign for Palm Beach County Property Appraiser. Nikolits moved for summary judgment. He first argued that Parrish, Wetzel and Lucas had offered no evidence that they were fired for political reasons. Alternatively, Nikolits argued that, because Parrish, Wetzel and Lucas held policymaking positions, Nikolits did not violate their First Amendment rights even if he fired them for political reasons.

The district court granted summary judgment in favor of Nikolits on the latter ground, both in his individual and official capacities. On the official capacity claim, the district court determined as a matter of law that Parrish, Wetzel and Lucas were

---

on taxable property after taxes have been levied." Fla.Stat. § 192.001(3) (1977). "Property appraisers may appoint deputies to act in their behalf in carrying out the duties prescribed by law." Fla.Stat. § 193.024 (1980). Property appraisals are carried out pursuant to state statute, see § 193.011 et seq. Florida Statutes, as well as professional appraisal standards established by the International Association of Assessing Officers and the Appraisal Institute.

"policymakers" and that, as such, Nikolits did not violate their constitutional rights even if he had fired them for political reasons. On the individual capacity claim, the district court held that, because the law was not clearly established that persons holding positions similar to those held by Parrish, Wetzel, and Lucas were "policymakers," qualified immunity applied and Nikolits did not violate clearly established law of which a reasonable person would have known in dismissing them for political reasons. We affirm the order granting summary judgment in favor of Nikolits insofar as he was sued in his individual capacity because the law was not clearly established that dismissing Parrish, Wetzel and Lucas for political reasons violated their First Amendment rights. But we vacate and remand the summary judgment insofar as Nikolits was sued in his official capacity because we find that the district court applied the wrong standard in making that determination.

## II. Analysis

In *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), a newly-elected Democratic sheriff of Cook County, Illinois, discharged certain non-civil service employees, including the Chief Deputy of the Process Division, a bailiff/security guard, and a process server, "because they did not support and were not members of the Democratic Party and had failed to obtain the sponsorship of one of its leaders." *Id.* at 351, 96 S.Ct. at 2678. Writing for a three-judge plurality of the majority,[3] Justice

---

[3]Justice Brennan wrote an opinion, joined by Justices White and Marshall. Justice Stewart wrote a separate opinion concurring only in the judgment that was joined by Justice Blackmun.

Brennan reasoned that the practice of patronage dismissals "clearly infringes First Amendment interests," and that

> if conditioning the retention of public employment on the employee's support of the in-party is to survive constitutional challenge, it must further some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end, and the benefit gained must outweigh the loss of constitutionally protected rights.

*Id.* at 362, 96 S.Ct. at 2685. Justice Brennan considered and rejected the interest of ensuring effective government and efficient public employees as an end that justified patronage, concluding that patronage dismissals were not the least restrictive means of achieving this end because public employees could be discharged for insubordination or poor job performance when those bases in fact exist. *Id.* at 364-67, 96 S.Ct. at 2685-86. Justice Brennan also considered and rejected the interest of preserving the democratic process and partisan politics, concluding that, because "patronage [also] is an effective *impediment* to associational and speech freedoms," "the gain to representative government provided by the practice of patronage, if any, would be insufficient to justify its sacrifice of First Amendment rights." *Id.* at 369-70, 96 S.Ct. at 2688 (emphasis added).

Justice Brennan finally considered the need for political loyalty of employees to the end that representative government not be undercut by tactics obstructing the implementation of policies of the new administration. He reasoned that "[t]he justification is not without force, but is nevertheless inadequate to validate patronage wholesale." He went on to state that "[l]imiting patronage dismissals to *policymaking positions* is sufficient to

achieve this governmental end." *Id.* at 367, 96 S.Ct. at 2687. Justice Brennan thus acknowledged a limited exception for policymaking positions to the general prohibition against patronage dismissals. He expounded on the contours of the exception:

> No clear line can be drawn between policymaking and nonpolicymaking positions. While nonpolicymaking individuals usually have limited responsibility, that is not to say that one with a number of responsibilities is necessarily in a policymaking position. The nature of the responsibilities is critical. Employee supervisors, for example, may have many responsibilities, but those responsibilities may have only limited and well-defined objectives. An employee with responsibilities that are not well defined or are of broad scope more likely functions in a policymaking position. In determining whether an employee occupies a policymaking position, consideration should also be given to whether the employee acts as an adviser or formulates plans for the implementation of broad goals.

*Id.* at 367-68, 96 S.Ct. at 2687. Justice Brennan noted that the governmental entity carried the burden of demonstrating an interest sufficient to override an encroachment on the First Amendment rights of a public employee, and that close cases should be resolved in favor of the employee.

In a short concurring opinion, Justice Stewart reasoned that the "single substantive question involved ... is whether a nonpolicymaking, *nonconfidential* government employee can be discharged or threatened with discharge from a job that he is satisfactorily performing upon the sole ground of his political belief." 427 U.S. at 375, 96 S.Ct. at 2690 (emphasis added). Justice Stewart's concurrence thus limited First Amendment protection to positions that were both nonpolicymaking and nonconfidential.

*Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), was the first case in which the Supreme Court announced a

majority opinion on the issue of patronage dismissals. *Branti* involved two assistant public defenders who were among six threatened with dismissal from a staff of nine because they were Republicans. The Court held that the dismissals would violate the First Amendment. In so holding, the Court stated that

> "[t]he ultimate inquiry is not whether the label "policymaker' or "confidential' fits a particular position; rather the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved."

*Id.* at 518, 100 S.Ct. at 1295.

*Branti* recognized that circumstances may exist in which "a position may be appropriately considered political even though it is neither confidential nor policymaking in character" but that "party affiliation is not necessarily relevant to every policymaking or confidential position." *Id.* at 518, 100 S.Ct. at 1294. Thus *Branti* recognized that a "policymaking" test would not be appropriate for a state university football coach, for example, even though he "formulates policy" in a sense, but such a test would be appropriate for a nonpolicymaking gubernatorial assistant hired to deal with political issues. *Id.*

With these principles in mind, we must determine whether, in this case, the district court erred in concluding that Nikolits legally could dismiss Parrish, Wetzel and Lucas. Although the district court briefly cited *Branti,* it is clear from the district court's order granting summary judgment for Nikolits that it applied the standard set forth in *Elrod,* not *Branti:*

> [T]he court finds that summary judgment is proper on the basis that plaintiffs held *policymaking positions.* ... Patronage dismissals of government employees holding *policymaking positions* do not violate the First Amendment.... [I]n

> determining whether an employee occupies a *policymaking position,* consideration should be given to whether the employee acts as an adviser or formulates plans for the implementation of broad goals."

In so proceeding, the district court considered determinative the fact that Parrish, Wetzel and Lucas were "policymakers."[4]

Although the record reflects disputed material facts as to whether Parrish, Lucas and Wetzel were policymakers, the district court committed a more basic legal error. After *Branti,* "[t]he ultimate inquiry is *not* whether the label "policymaker' or "confidential' fits a particular position," rather it is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved. Indeed, the former Fifth Circuit, shortly after *Branti* was decided, interpreted *Branti* as "dismissing the labels "confidential' and "policymaker' as irrelevant." *See Barrett v. Thomas,* 649 F.2d 1193, 1200 (5th Cir. Unit A 1981).

It is important to place to the side issues that should not enter an analysis of determining whether party affiliation is an appropriate requirement for the effective performance of a particular position. The interest in ensuring effective government and efficient government employees should not be a factor in determining whether an employee is susceptible to patronage dismissal. This is an interest that is appropriately addressed by dismissals for insubordination or incompetence. In addition,

---

[4]The court acknowledged that factual disputes existed as to whether Parrish, Wetzel and Lucas held *confidential* positions, but concluded that there was no factual dispute that Parrish, Wetzel and Lucas held policymaking positions and that, as a result, they were subject to patronage dismissal.

political affiliation or loyalty does not equate with confidence an elected official may have in his or her employees. *See Branti,* 445 U.S. at 520 n. 14, 100 S.Ct. at 1295-96 n. 14. Similarly, high salaries are not indicative of a position that requires a particular party affiliation as government employees' pay should be a reflection of competence, ability and experience, rather than a reward for party affiliation.

In reading *Branti* this way, we fall into line with those circuits interpreting *Branti* as teaching that *party affiliation* must be essential to effective performance of a position before an employee holding that position can be susceptible to patronage dismissal. *See Dickeson v. Quarberg,* 844 F.2d 1435, 1443 (10th Cir.1988); *Jones v. Dodson,* 727 F.2d 1329 (4th Cir.1984). The inherent powers and actual job responsibilities of the position involved, and the relationship of the particular position to the elected official, also should be part of the analysis. *See Terry v. Cook,* 866 F.2d 373, 377-78 (11th Cir.1989); *Ray v. Leeds,* 837 F.2d 1542, 1544 (11th Cir.1988). We part ways with those circuits that allow patronage dismissals in policymaking positions that do not directly implicate *partisan* political concerns. *See Jimenez Fuentes v. Torres Gaztambide,* 807 F.2d 236, 249-50 (1st Cir.1986); *Tomczak v. City of Chicago,* 765 F.2d 633, 641 (7th Cir.1985).

In this case, the district court did not address how Nikolits met his burden of demonstrating that party affiliation is an appropriate requirement for the effective performance of the positions at issue here, involving computers, appraisal standards and personnel matters.

There is no evidence in the record as to whether the Appraiser's Office, whose mission is to appraise property for tax purposes based on formulae set by statute and professional standards, even implicates partisan concerns in the first instance. We conclude, in light of the current record, that summary judgment insofar as Nikolits was sued in his official capacity must be vacated.

Insofar as Nikolits was sued in his individual capacity, the district court granted him summary judgment on qualified immunity grounds. *See, e.g., Hill v. Dekalb Regional Youth Detention Ctr.,* 40 F.3d 1176, 1184-85 n. 16 (11th Cir.1994) (explaining the difference between individual capacity claims and official capacity claims). The plaintiffs appeal that order, as well. Because "[a] decision on qualified immunity is separate and distinct from the merits of the case," *Lassiter v. Alabama A & M Univ. Bd. of Trustees,* 28 F.3d 1146, 1151 (11th Cir.1994) (en banc), our previous discussion does not dispose of the qualified immunity issues in this case.

The Supreme Court has explained that the policies behind the qualified immunity defense dictate that it be decided as early as possible in a case. *See, e.g., Behrens v. Pelletier,* --- U.S. ---- , ---- - ----, 116 S.Ct. 834, 838-40, 133 L.Ed.2d 773 (1996); *Anderson v. Creighton,* 483 U.S. 635, 646 n. 6, 107 S.Ct. 3034, 3042 n. 6, 97 L.Ed.2d 523 (1987) ("[W]e have emphasized that qualified immunity questions should be resolved at the earliest possible stage of a litigation."). Accordingly, we turn to the district court's order granting summary judgment to Nikolits in his

individual capacity on qualified immunity grounds.

Once a public official or employee defendant raises a qualified immunity defense, the "plaintiffs bear the burden of showing that the federal "rights' allegedly violated were "clearly established.' " *Lassiter,* 28 F.3d at 1150 n. 3. In seeking to discharge that burden, the plaintiffs in this case rely upon the fact that their attorney sent Nikolits a letter warning him that discharging plaintiffs would violate the law. Even if we were to assume that that letter actually caused Nikolits to believe that the action he took was contrary to federal law (and there is no evidence that it did), we have previously held that the subjective belief of the defendant is irrelevant to a qualified immunity inquiry, because the measure is purely one of objective legal reasonableness. *Lassiter,* 28 F.3d at 1150.

Plaintiffs also contend that Nikolits is not entitled to qualified immunity, because the *Elrod* and *Branti* decisions clearly established the constitutional rule of law that Nikolits' actions violated.

Under our case law, Nikolits is entitled to qualified immunity in his individual capacity unless Parrish, Wetzel and Lucas can demonstrate not only that Nikolits violated *Branti* in firing them, but also that it was *clearly established* at the time that Nikolits's actions violated *Branti. See Williamson v. F.H. Mills,* 65 F.3d 155, 157 (11th Cir.1995) (quoting *Lassiter,* 28 F.3d at 1150). The Supreme Court stated in *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 133 L.Ed.2d 773 (1987), that, for a plaintiff to overcome qualified immunity,

the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

483 U.S. at 640, 107 S.Ct. at 3039.

We recently held in *Beauregard v. Olson,* 84 F.3d 1402, 1405 (11th Cir.1996), that it was not clearly established under *Branti* that the dismissal of clerical employees of a county tax collector's office for political reasons violated their First Amendment rights. *Beauregard* controls the qualified immunity analysis in this case. Moreover, it is not entirely without significance that the district court, with full briefing and two years after Nikolits' actions, concluded that those actions did *not* violate the law. Finally, we note that plaintiffs' argument that the law was clearly established by *Elrod* and *Branti* is further undermined by the split of the circuits concerning what those two decisions mean. *See supra* our discussion at 2510; *see also Mitchell v. Forsyth,* 472 U.S. 511, 533-36, 105 S.Ct. 2806, 2819-20, 86 L.Ed.2d 411 (1985) (holding that official defendant was entitled to qualified immunity and noting that legal uncertainty about the meaning of a Supreme Court decision was "reflected in the decisions of the lower federal courts").

While we have endeavored in this opinion to provide some specific guidance to the district courts on this subject, in examining clearly established law for qualified immunity purposes, we look only to the law as it existed on January 5, 1993, the date

Nikolits terminated the plaintiffs' employment. *See, e.g., Mitchell,* 472 U.S. at 530–36, 105 S.Ct. at 2817–20, 86 L.Ed.2d 411 (1985); *Belcher v. City of Foley, Ala.,* 30 F.3d 1390, 1400 n. 9 (11th Cir.1994). Under these standards, we affirm the district court's grant of summary judgment to Nikolits insofar as he was sued in his individual capacity.

For the foregoing reasons, we AFFIRM the summary judgment entered in favor of Nikolits on the individual capacity claims and VACATE the summary judgment entered in favor of Nikolits on the official capacity claims and remand this case to the district court for further proceedings consistent with this opinion.

AFFIRMED in part, VACATED and REMANDED in part.