United States Court of Appeals,

Eleventh Circuit.

Nos. 95-4982 & 95-5176.

Richard Mark CUTCLIFFE, Vicki Cutcliffe, George Raggio, Jr., Carole Raggio, Plaintiffs-Counter-Defendants-Appellants,

v.

Ronald COCHRAN, as Sheriff of Broward County, Florida, Norman Botsford, individually, Defendants-Counter-Claimants-Appellees.

July 29, 1997.

Appeals from the United States District Court for the Southern District of Florida. (No. 93-6099-CIV-WDF), Wilkie D. Ferguson, Jr., Judge.

Before BARKETT, Circuit Judge, KRAVITCH, Senior Circuit Judge, and HARRIS[*], Senior District Judge.

BARKETT, Circuit Judge:

In this action, based on 42 U.S.C. § 1983, alleging dismissal based on the exercise of protected speech and association, plaintiffs, former deputy sheriffs in the Broward County Sheriff's Office, appeal the district court's summary judgment in favor of Ronald Cochran, Sheriff of Broward County. The district court found that the deputies had been fired because of political affiliation. The court then concluded that under *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), and *Terry v. Cook,* 866 F.2d 373 (11th Cir.1989), political affiliation was an appropriate requirement for the position of deputy sheriff, and granted Cochran's motion for summary judgment.

Defendant Ronald Cochran, a Democrat, was elected Sheriff of Broward County in a contest with a Republican candidate who had defeated incumbent Sheriff Nick Navarro in the Republican primary. The plaintiffs, appointed to their deputy sheriff positions by Navarro, actively supported him in the primary election. They allege that they were dismissed from these positions in retaliation for their political activities on behalf of Navarro and for their familial association with a former

[*]Honorable Stanley S. Harris, Senior U.S. District Judge for the District of Columbia, sitting by designation.

opponent of Sheriff Cochran, violating their First Amendment rights to political speech and political and intimate association.

We review grants of summary judgment de novo, applying the same legal standard that the district court used. *McCabe v. Sharrett,* 12 F.3d 1558, 1560 (11th Cir.1994). Summary judgment is appropriate if, after examining the entire record, the court concludes there is no genuine issue of material fact. Fed.R.Civ.P. 56(c).

Plaintiffs claim that their dismissals violated political speech, familial association, and political affiliation or association rights protected by the First Amendment. Plaintiffs can avoid summary judgment by pointing to evidence in the record which, if credited, would permit a rational fact-finder to conclude that their conduct was constitutionally protected and that the protected conduct was a substantial factor in their dismissals. *Mt. Healthy City School District Board of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

Plaintiffs have asserted little more than the fact of their familial relationship to Cochran's alleged political nemesis, Leo Callahan, to support their view that this relationship was a substantial or motivating factor in their dismissals. As a result, they have failed to create a question of material fact which would warrant presentation of their familial association claim to a fact-finder; summary judgment on that claim, therefore, was appropriate. We turn now to plaintiffs' claims that their dismissals violated their First Amendment speech and association rights.

It is well settled that an individual is not stripped of First Amendment rights simply by virtue of government employment. "Absent some reasonably appropriate requirement, government may not make public employment subject to the express condition of political beliefs or prescribed expression." *O'Hare Truck Service, Inc. v. City of Northlake,* --- U.S. ----, ----, 116 S.Ct. 2353, 2357, 135 L.Ed.2d 874 (1996). In fashioning legal standards for evaluating which restrictions are "reasonably appropriate," the Supreme Court has developed two lines of inquiry: the *Elrod-Branti* standard for discrimination based on political affiliation and a balancing test for discrimination based on political speech. *See Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708

(1983). *See also Bd. of Cty. Com'rs, Wabaunsee County, KS. v. Umbehr,* --- U.S. ----, ----, 116 S.Ct. 2342, 2347, 135 L.Ed.2d 843 (1996) (collecting cases).

The Supreme Court first addressed the issue of political affiliation as a legitimate employment criterion in *Elrod v. Burns.* The case involved a newly elected Democratic sheriff who fired various Republican employees in the sheriff's office and held that politically motivated discharges were unconstitutional because they amounted to a denial of a government benefit based on an unconstitutional condition, namely the coercion of an employee's freedom of association. While the government might legitimately use such practices in some circumstances, the strict scrutiny applicable to infringements of First Amendment rights requires the government to show that the practice furthers a vital government interest by the least restrictive means. The plurality[1] reasoned:

> if conditioning the retention of public employment on the employee's support of the in-party is to survive constitutional challenge, it must further some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end, and the benefit gained must outweigh the loss of constitutionally protected rights.

*Id.* at 362, 96 S.Ct. at 2685. Thus, patronage dismissals were not the least restrictive means of achieving this end because public employees could be discharged for insubordination or poor job performance when those bases in fact exist. *Id.* at 364-67, 96 S.Ct. at 2685-86. Likewise, the interest of preserving the democratic process and partisan politics does not warrant such dismissals because "patronage [also] is an effective *impediment* to associational and speech freedoms ... the gain to representative government provided by the practice of patronage, if any, would be insufficient to justify its sacrifice of First Amendment rights." *Id.* at 369-70, 96 S.Ct. at 2688 (emphasis added).

Also incapable of fully supporting patronage dismissals is the notion that new administrations in a representative government need the political loyalty of employees in order to avoid potentially obstructionist tactics. "The justification is not without force, but is nevertheless inadequate to validate patronage wholesale ... Limiting patronage dismissals to policymaking

---

[1]Justice Brennan wrote an opinion, joined by Justices White and Marshall. Justice Stewart wrote a separate opinion concurring only in the judgment that was joined by Justice Blackmun.

positions is sufficient to achieve this governmental end." *Id.* at 367, 96 S.Ct. at 2687. In delineating the exception, it was recognized that:

> No clear line can be drawn between policymaking and nonpolicymaking positions. While nonpolicymaking individuals usually have limited responsibility, that is not to say that one with a number of responsibilities is necessarily in a policymaking position. The nature of the responsibilities is critical. Employee supervisors, for example, may have many responsibilities, but those responsibilities may have only limited and well-defined objectives. An employee with responsibilities that are not well defined or are of broad scope more likely functions in a policymaking position. In determining whether an employee occupies a policymaking position, consideration should also be given to whether the employee acts as an adviser or formulates plans for the implementation of broad goals.

*Id.* at 367-68, 96 S.Ct. at 2687. Finally, the plurality in *Elrod* held that the government had not met its burden in demonstrating an interest sufficient to override an encroachment on the First Amendment rights of a public employee, and that close cases should be resolved in favor of the employee. *Id.* at 368, 96 S.Ct. at 2687.

In *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), the majority of the Court held that the dismissal of two assistant public defenders, who were among six threatened with dismissal from a staff of nine because they were Republicans, violated the First Amendment. In its holding, the Court refined the applicability of the First Amendment to policymaking positions:

> [t]he ultimate inquiry is not whether the label "policymaker' or "confidential' fits a particular position; rather the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved."

*Id.* at 518, 100 S.Ct. at 1295.

*Branti* recognized that circumstances may exist in which "a position may be appropriately considered political even though it is neither confidential nor policymaking in character" but that "party affiliation is not necessarily relevant to every policymaking or confidential position." *Id.* at 518, 100 S.Ct. at 1294.

Shortly after *Branti* was decided, this court decided *Terry v. Cook.* In *Terry,* a newly elected sheriff refused to reappoint any of the deputy sheriffs, clerks, jailers or process servers who served under his predecessor. The court held that "loyalty to the individual sheriff and the goals and policies he seeks to implement ... is an appropriate requirement for the effective performance of a deputy sheriff." *Id.* at 377. The court described deputy sheriffs as the "alter ego" of the sheriff and

reasoned that the "closeness and cooperation required between sheriffs and their deputies necessitates the sheriff's absolute authority over their appointment and/or retention." *Id.* at 377. The court concluded that deputy sheriffs were susceptible to patronage dismissals.

In this case, although plaintiffs allege that their dismissals were motivated by political association (among other factors), they argue that *Terry* is not controlling because Cochran has engaged in selective dismissals, and not the "wholesale" or "en masse" dismissals conducted in *Terry*. We are not persuaded by this distinction. While *Terry* did involve the dismissal of the entire deputy sheriff force, that factor is not essential to its broad holding that sheriffs have the authority to fire their deputies for political affiliation reasons. Accordingly, we find *Terry* controlling, although we also believe that *Terry* should be revisited en banc because it may be viewed as inconsistent with *Branti*.

*Branti* flatly rejects the notion that policy makers qua policy makers should be subject to a political affiliation requirement; rather, it demands a showing that the position, policy-making or otherwise, implicates partisan political concerns in its effective functioning. Under *Branti,* political fealty could be required of deputy sheriffs whose job duties involved handling information of a partisan political nature. But other deputy sheriffs, involved in investigating crimes, patrolling roads, or transporting prisoners, may never deal with such sensitive information or confidences. *Terry* could be viewed as ignoring this distinction, and offering no explanation for how the duties of individual deputy sheriffs relates to party affiliation.[2]

The *Terry* court's confusion in applying the *Elrod-Branti* standard is not surprising as there appears to be a conflict among the circuits in patronage cases arising in sheriffs' offices. After examining the various tasks of deputy sheriffs, courts in the Third, Fourth, Fifth, and Tenth Circuits have ruled that those job functions do not require political affiliation with the elected sheriff for their

---

[2]We note that the *Terry* court properly applies *Branti* when it turns to the claims brought by the other personnel in the sheriff's office: "This is a determination that depends upon the actual responsibilities of each position and the relationship of each to the sheriff." *Id.* at 378.

effective performance. Thus, deputy sheriffs are entitled to protection from patronage dismissals.[3]

In addition to this circuit, only the Seventh Circuit has held that deputy sheriffs may be hired or fired on political grounds.

In *Upton v. Thompson,* 930 F.2d 1209 (7th Cir.1991), *cert. denied,* 503 U.S. 906, 112 S.Ct. 1262, 117 L.Ed.2d 491 (1992), and in *Dimmig v. Wahl,* 983 F.2d 86 (7th Cir.), *cert. denied,* 510 U.S. 861, 114 S.Ct. 176, 126 L.Ed.2d 135 (1993), the Seventh Circuit held that political affiliation was an appropriate requirement for the job of deputy sheriff because a sheriff's political fortunes were so closely tied to the job performance of deputy sheriffs. This reasoning was adopted from an earlier Seventh Circuit case, *Tomczak v. City of Chicago,* 765 F.2d 633, 641 (7th Cir.1985).[4]

Notwithstanding that plaintiffs may be entitled to a factual determination under *Branti* as to whether their positions implicate partisan political concerns in their effective functioning, we read their claim as precluded by *Terry.* We are bound by that prior panel decision which only the en banc court can reverse.

Plaintiffs also allege that, rather than mere political affiliation, other conduct protected by

---

[3]*Burns v. County of Cambria,* 971 F.2d 1015, 1022 (3rd Cir.1992), *cert. denied,* 506 U.S. 1081, 113 S.Ct. 1049, 122 L.Ed.2d 357 (1993); *Jones v. Dodson,* 727 F.2d 1329 (4th Cir.1984); *Barrett v. Thomas,* 649 F.2d 1193, 1201 (5th Cir.1981), *cert. denied,* 456 U.S. 925, 102 S.Ct. 1969, 72 L.Ed.2d 440 (1982); *Francia v. White,* 594 F.2d 778 (10th Cir.1979).

[4]Application of the Seventh Circuit's broad test has led to results far afield from *Branti.* In *Americanos v. Carter,* 74 F.3d 138 (7th Cir.1996), for example, the Seventh Circuit concluded that *every* Deputy Attorney General in Indiana's Attorney General's Office was subject to patronage dismissal because each had "meaningful input into governmental decisionmaking on issues where there is room for principled disagreement on goals and implementation." *Id.* at 141-42. *Americanos* appears to lie in sharp contrast to the facts of *Branti* itself, where the Supreme Court held that assistant public defenders were protected from patronage dismissal, even when the staff consisted of only nine public defenders. We further contrast *Americanos* with Justice Powell's dissent in *Branti,* where he questioned whether, under the holding in *Branti,* the United States Attorney for each district, not Assistant U.S. Attorneys, could be dismissed for political reasons:

> [I]t would be difficult to say, under the Court's standard, that "partisan" concerns properly are relevant to the performance of the duties of a United States Attorney.

> 445 U.S. at 524, 100 S.Ct. at 1298 (Powell, J. dissenting). Although *Branti* may permit the dismissal of *the* U.S. Attorney of a district and some of his or her chief deputies, we believe *Branti* would not permit the dismissal of all Assistant U.S. Attorneys for patronage reasons.

the First Amendment prompted their dismissals. Specifically, plaintiffs asserted in their complaint that they "participated in public political activity in support of Navarro on several occasions ... and contributed personal funds to Navarro's campaign." This allegation simply conveys plaintiffs' political affiliation. Had there been allegations that the expressions involved more than bare statements of support for a candidate, the claim would deserve a more detailed analysis under *Pickering*.[5] At this point, as in *Branti,* the only interest at issue is the right of political affiliation which, that case teaches us, cannot be overcome except by a determination that affiliation is essential to the employee's effectiveness. The record supports the district court's finding that plaintiffs "were terminated on the basis of their loyalty and support for the former sheriff. This is a classic *Elrod-Branti* political patronage dismissal case."

Under *Terry v. Cook,* defendant was entitled to a grant of summary judgment.

AFFIRMED.

KRAVITCH, Senior Circuit Judge, specially concurring:

I join Judge Barkett's opinion for the court, except that I take no position regarding whether the en banc court should or should not reexamine the holding of *Terry v. Cook,* 866 F.2d 373 (11th Cir.1989).

HARRIS, Senior District Judge, specially concurring:

I concur in the result reached by the majority, believing, as Judges Barkett and Kravitch do, that this court's opinion in *Terry v. Cook,* 866 F.2d 373 (11th Cir. 1989), is controlling and necessitates affirmance. I also believe, however, that certain aspects of this case warrant additional comments, some of which reflect disagreement with respect to portions of the majority opinion.

An analysis of the legal issues inevitably begins with the unique case of *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). There, two diametrically opposed viewpoints were expressed: one by Justice Brennan, joined by Justices White and Marshall, and one by Justice

---

[5]More precisely, had there been further allegations that (1) plaintiffs had engaged in expressive conduct beyond mere manifestation of political affiliation; and (2) the conduct was a "substantial" or "motivating" factor in the dismissals, their claim would warrant a *Pickering* analysis.

Powell, joined by Chief Justice Burger and Justice Rehnquist. Thus, there were three votes one way, and three the other. Such a split, obviously, would not have been affirmatively dispositive. So, enter Justice Stewart, joined by Justice Blackmun. To create a 5-3 disposition of the case, Justice Stewart stated both briefly and clearly (427 U.S. at 374-75, 96 S.Ct. at 2690):

> Although I cannot join the plurality's wide-ranging opinion, I can and do concur in its judgment.

> This case does not require us to consider the broad contours of the so-called patronage system, with all its variations and permutations. In particular, it does not require us to consider the constitutional validity of a system that confines the hiring of some governmental employees to those of a particular political party, and I would intimate no views whatever on that question.

> The single substantive question involved in this case is whether a nonpolicy making, nonconfidential government employee can be discharged or threatened with discharge from a job that he is satisfactorily performing upon the sole ground of his political beliefs. I agree with the plurality that he cannot. See *Perry v. Sindermann,* 408 U.S. 593, 597-598, 92 S.Ct. 2694, 2697-2698, 33 L.Ed.2d 570.

It is noted that Justice Stewart characterized Justice Brennan's opinion as a "plurality" opinion, and typically it is so labeled (or mislabeled). However, analytically it seems to me that the use of that term elevates Justice Brennan's opinion—thoughtful as it may have been, as was Justice Powell's opposing opinion—to a status beyond that to which it is entitled. It is my belief that *Elrod v. Burns* stands for what Justice Stewart said, and that Justice Brennan's "wide-ranging opinion" does not have meaningful viability beyond the limited contours set by Justices Stewart and Blackmun. Thus, I do not believe that the majority's reliance upon Justice Brennan's opinion, beyond the boundaries established by Justice Stewart's brief opinion, is justified.[1]

The next relevant case to be decided by the Supreme Court was *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). There, a true majority opinion was issued, written by Justice Stevens. The interrelationship between *Branti* and *Elrod* is intriguing. Initially, consistent with what I have suggested, Justice Stevens found it necessary to cobble together the separate opinions of Justices Brennan and Stewart in *Elrod v. Burns* in order to extract a holding, however

---

[1] I believe the same is true with respects to this court's opinion in *Parrish v. Nikolits,* 86 F.3d 1088 (11th Cir. 1996), in which (in an opinion also written by Judge Barkett) there are numerous references to Justice Brennan's reasoning in *Elrod v. Burns.*

limited, from that case. *See, e.g., id.* at 516-17, 100 S.Ct. at 1294. The case involved two Assistant Public Defenders from Rockland County, New York, who faced dismissal solely because of their political affiliation. Thus, *Branti* was a pure political patronage case.[2] The Court concluded that the county Assistant Public Defenders could not be dismissed based only upon their political affiliation. Justice Stewart, whose acquiescence in the judgment was essential to the decision in *Elrod,* dissented in *Branti* (as did Justices Powell and Rehnquist). His dissent began (*id.* at 521, 100 S.Ct. at 1296):

> I joined the judgment of the Court in *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547, because it is my view that, under the First and Fourteenth Amendments, "a nonpolicymaking, nonconfidential government employee can[not] be discharged ... from a job that he is satisfactorily performing upon the sole ground of his political beliefs." *Id.,* at 375, 96 S.Ct., at 2690. That judgment in my opinion does not control the present case for the simple reason that the respondents here clearly are not "nonconfidential" employees.

In his dissent in *Branti,* Justice Powell noted in part (*id.* at 524, 100 S.Ct. at 1297):

> In *Elrod v. Burns,* three Members of the Court joined a plurality opinion concluding that nonpolicymaking employees could not be dismissed on the basis of political affiliation. Two Members of the Court joined an opinion concurring in the judgment and stating that nonpolicymaking, nonconfidential employees could not be so dismissed. Notwithstanding its purported reliance upon the holding of *Elrod,* the Court today ignores the limitations inherent in both views. (Internal citations omitted.)

Justice Powell shortly thereafter stated (*id.* at 525, 100 S.Ct. at 1297):

> The standard articulated by the Court is framed in vague and sweeping language certain to create vast uncertainty.[3]

Is there confusion in this area of the law? Members of the Supreme Court are among those

---

[2]It should be noted that in *Elrod v. Burns,* the Chief Justice also wrote a dissent, beginning it by stating (427 U.S. at 375, 96 S.Ct. at 2690):

> The Court's decision today represents a significant intrusion into the area of legislative and policy concerns—the sort of intrusion Mr. Justice BRENNAN has recently protested in other contexts.

[3]Justice Powell went on, *inter alia,* to point out some of the problems raised by *Branti,* including a reference to how important political affiliation is to the selection by the President of United States Attorneys. (445 U.S. at 525-27, 100 S.Ct. at 1298.) Of course, Justice Powell is aware that United States Attorneys are presidential appointees who serve at the pleasure of the President. It puzzles me as to how the majority in this case can take Justice Powell's comments in a dissent in a case involving county Assistant Public Defenders, bring them into this case—which involves county Deputy Sheriffs—and volunteer dicta as to what may or may not be done with respect to the employment of Assistant United States Attorneys. *See* fn. 4 of majority opinion.

who have expressed their belief that there is, and my study of the subject matter leads me to the same conclusion.[4] The majority in this case expresses its belief that there was "confusion" on the part of this court's *Terry* panel in deciding that case. To the extent that there can be an absence of confusion in this area of the law (and I acknowledge that I consider Justice Powell's reasoning to be more sound than that of those espousing conflicting views), I believe the *Terry* panel correctly decided the case before it.

Judge Barkett's opinion for the majority states that "we also believe that *Terry* should be revisited en banc because it may be viewed as inconsistent with *Branti*." It is implied that the way to revisit *Terry* is through this case. I respectfully disagree. Judge Kravitch, in her special concurrence, expressly takes no position on this question. There are several reasons for my disagreement. First, I think *Terry v. Cook* was correctly decided. Second, *Branti* was a pure political affiliation case (although, as noted, Justice Stewart dissented in *Branti* because he viewed Assistant Public Defenders as "clearly ... not "non-confidential' employees.") Here, appellants engaged in extensive activities on behalf of one of Cochran's opponents.[5] In footnote 1 in his summary judgment opinion, the trial judge stated:

> Although Sheriff Cochran was the Democratic candidate and Navarro ran as a Republican, affiliation with a particular party is not the issue here. Political patronage in this case refers not to political party affiliation, but rather to what other courts have described as the employees' "commonality of political purpose and support." See, e.g., *Williams v. City of River Rouge,* 909 F.2d 151, 153, n.4 (6th Cir. 1990).

---

[4]This uncertainty should make a prudent court—like the panel in *Terry v. Cook*—reluctant to extend *Branti* much beyond both its factual context and the true meaning of *Elrod.*

[5]The appellants' depositions were taken. Their principal political activities were conducted in the primary, in support of a candidate who would have faced Sheriff Cochran had he not lost in the primary. The Cutcliffe appellants (Mark and Vicki) gave money personally (perhaps the maximum of $2,000) and collected more than an additional $10,000 for Navarro. They purchased campaign tickets (barbecues, etc.) and sold them to co-workers. They put Navarro signs around their home. They and their children stuffed envelopes for Navarro's re-election committee, and Vicki told her co-workers that Navarro would be a better sheriff than Cochran.

> The Raggio appellants (George and Carole) contributed the maximum allowable amount to Navarro's campaign. Carole solicited funds from business people, and carried Navarro signs in public. She attended as many Navarro functions as she could, and recommended Navarro as the better choice, although she did not openly criticize Cochran. Other than contributing the maximum permissible to Navarro's campaign, George Raggio did not describe his support specifically.

Third, to me there is a significant difference between a county's Assistant Public Defender (as in *Branti*) and a county's Deputy Sheriff, the former's job is simply to defend those charged with a crime, while the latter's responsibilities frequently involve a high degree of trust in sensitive areas of law enforcement, including possible public corruption.[6] Fourth, even if the *Terry* panel could be considered to have decided that case imperfectly, the situation before us will not recur under currently existing statutory law. Since 1995, Florida's law has provided as follows:

30.078. Continuation of appointment after a change in sheriff

When a newly elected or appointed sheriff assumes office, the incoming sheriff may not terminate the employment of any deputy sheriff covered by ss. 30.071-30.079 for lawful off-duty political activity or for a discriminatory reason. The incoming sheriff may replace deputy sheriffs assigned to managerial, confidential, or policymaking positions or part-time deputy sheriffs.

In sum, I concur in the result, and an of the belief that *Terry v. Cook* was decided correctly. While the decision as to whether to revisit that opinion through going en banc in this case is up to my distinguished temporary colleagues, the issue now is dealt with by statute and I believe this case should end here—although I also believe that the subject matter cries out for elucidation from the Supreme Court in some appropriate future case.

---

[6]The *Terry v. Cook* panel stated in part (866 F.2d at 377):

The closeness and cooperation required between sheriffs and their deputies necessitates the sheriff's absolute authority over their appointment and/or retention.